# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued May 13, 2021　　　　　　Decided March 4, 2022

No. 20-1033

LONG ISLAND POWER AUTHORITY AND LONG ISLAND
LIGHTING COMPANY, D/B/A LIPA,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN ELECTRIC POWER SERVICE CORPORATION, ET AL.,
INTERVENORS

————

Consolidated with 20-1035, 20-1273

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Michael F. McBride* argued the cause for petitioners Long
Island Power Authority, et al. *Eric J. Konopka* argued the
cause for petitioner Linden VFT, LLC. On the briefs were
*Richard P. Bress*, *David L. Schwartz*, and *Joseph B. Nelson*.

*Anand R. Viswanathan*, Attorney, Federal Energy
Regulatory Commission, argued the cause for respondent.

2

With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*John Longstreth* argued the cause for respondent-intervenors. With him on the brief were *Gary E. Guy, Donald A. Kaplan, Cara J. Lewis, Richard P. Sparling, Bradley R. Miliauskas, Morgan E. Parke, Evan K. Dean, Pauline Foley, Paul M. Flynn, Miles H. Mitchell, Stacey Burbure, Robert Adkins, David Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Werner L. Margard*, Assistant Attorney General, *Steven D. Hughey* and *Spencer A. Sattler*, Assistant Attorneys General, Office of the Attorney General for the State of Michigan, *Daniel E. Frank, Allison E. Speaker, Kriss E. Brown, Aspassia V. Staevska, Christian A. McDewell, Gurbir S. Grewal*, Attorney General, Office of the Attorney General for the State of New Jersey, *Paul Youchak*, Deputy Attorney General, *Christopher R. Jones, Molly Suda,* and *Christopher J. Barr. William M. Keyser III, Steven M. Nadel*, and *Alex Moreau*, Deputy Attorney General, Office of the Attorney General for the State of New Jersey, entered appearances.

Before: HENDERSON, KATSAS, and WALKER, *Circuit Judges*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: This case arises from a long-running dispute over how to allocate the costs of high-voltage facilities to transmit electricity within the mid-Atlantic planning region. The question is difficult because high-voltage projects afford two different kinds of benefits—local benefits that accrue primarily to utilities close to the project at issue, and regional benefits that accrue throughout the grid. The Seventh Circuit has twice set aside cost allocations that ignored

3

the local benefits, *Illinois Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) (*Illinois Commerce I*); *Illinois Commerce Comm'n v. FERC*, 756 F.3d 556 (7th Cir. 2014) (*Illinois Commerce II*), and we have set aside cost allocations that ignored the regional benefits, *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018).

This case involves a contested settlement covering high-voltage projects approved between 2007 and 2013. The settlement allocates their costs through hybrid formulas that account for both local and regional benefits. In that respect, it tracks the allocation formula for high-voltage projects approved after 2013, which is not challenged here.

The Federal Energy Regulatory Commission approved the settlement over the objection of two utilities that transmit electricity from the mid-Atlantic region to New York. These utilities argue that the approval was inconsistent with the Seventh Circuit's decisions, with FERC's own precedent, and with an underlying cost-causation principle. One of the utilities also argues that FERC erroneously assigned it costs based on a flawed interpretation of the settlement. We agree with the second contention but not the first.

I

A

The Federal Power Act requires utilities to charge "just and reasonable" rates for the transmission of electricity in interstate commerce. 16 U.S.C. § 824d(a). To be just and reasonable, rates must "reflect to some degree the costs actually caused by the customer who must pay for them." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (cleaned up). This "cost causation principle" requires "comparing the costs assessed against a party to the burdens

4

imposed or benefits drawn by that party." *Id.* If FERC determines that a particular rate is unjust or unreasonable, it must "determine the just and reasonable rate." 16 U.S.C. § 824e(a).

B

PJM Interconnection, LLC is the regional transmission organization (RTO) for an area encompassing much of the mid-Atlantic and part of the Midwest. PJM takes its name from Pennsylvania, New Jersey, and Maryland, the first three states in which it operated, but its territory now extends as far west as Illinois. As an RTO, PJM coordinates the movement of electricity across the region. It operates transmission facilities owned by member utilities, approves the construction of new facilities, and files tariffs allocating among its members the costs of the facilities.

This case involves high-voltage transmission facilities within the PJM region. For over a decade, member utilities disputed how to allocate the cost of these projects, which provide both local and regional benefits. The facilities most obviously benefit nearby utilities that use them directly, but they also provide "backbone infrastructure" that improves reliability and reduces congestion regionwide. *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,063, P 80 (2007) (Opinion No. 494). A geographic asymmetry exacerbated the dispute: Given the location of generators, electricity must flow longer distances to reach consumers in the eastern part of PJM than to reach their western counterparts. And because high-voltage facilities work best to transmit electricity over long distances, they are more useful in the eastern part. *See Ill. Com. II*, 756 F.3d at 558; *Ill. Com. I*, 576 F.3d at 475.

Initially, PJM allocated the cost of its high-voltage facilities based on what FERC calls the violation method (or,

5

less concisely, the violation-based distribution-factor method).
This method assumes that new projects are approved in
response to violations of reliability standards at overburdened
facilities.  And it allocates costs based on use of those facilities
at the time of each violation.  The violation method thus deems
utilities using overburdened facilities to have "cause[d]" the
relevant problem and to "benefit from" upgrades that eliminate
it.  *See* Opinion No. 494, 119 FERC ¶ 61,063, P 2 n.3.

In 2007, FERC ordered PJM to replace its violation
method with a "postage stamp" method.  This method allocates
the cost of a new facility in proportion to each utility's sale of
electricity, regardless of where the facility is located or how
much each utility uses it.  The Commission reasoned that the
postage-stamp method accounts for the regional benefits of
high-voltage facilities, incentivizes their development, and
avoids the trouble of quantifying the specific benefits that each
facility provides to each utility.  Opinion No. 494, 119 FERC
¶ 61,063, PP 79–82.

In *Illinois Commerce I*, the Seventh Circuit set aside
FERC's order.  It reasoned that FERC had failed to make "even
the roughest of ballpark estimates" of the regional benefits said
to justify the postage-stamp method and had also failed to
explain why quantifying the local benefits—as it continued to
do for low-voltage projects—was now too difficult.  576 F.3d
at 475–78.  Moreover, PJM's geographic asymmetry made the
distinction between local and regional benefits important:
Because nearly all the high-voltage facilities were built in the
eastern part of the grid, fully regionalizing their costs would
substantially overcharge the western utilities.  *Id.* at 475–76.

On remand, FERC again ordered the postage-stamp
method.  *PJM Interconnection L.L.C.*, 138 FERC ¶ 61,230
(2012) (Remand Order).  It concluded that the violation method

6

was unjust and unreasonable because it ignores both regional benefits and the changing use of individual facilities over time. *Id.* PP 38–41. The Commission then concluded that the postage-stamp method was just and reasonable because it accounts for the significant, though difficult to quantify, "system-wide benefits" to the PJM grid. *Id.* P 49. On the record before it, FERC considered only the violation and postage-stamp methods, but it encouraged PJM stakeholders to develop "hybrid" or other allocation methods. *Id.* P 2.

The Seventh Circuit set aside the Remand Order in *Illinois Commerce II.* The court again faulted FERC for giving neither a cost-benefit analysis nor an explanation of why such an analysis was infeasible. 756 F.3d at 561. And it again concluded that the postage-stamp method was "guaranteed to overcharge the western utilities, as they will benefit much less than the eastern utilities from eastern projects that are designed to improve the electricity supply in the east." *Id.*

C

While the *Illinois Commerce* litigation was ongoing, FERC promulgated a regulation known as Order No. 1000, which restructured arrangements for the coordinated transmission of electricity. Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 136 FERC ¶ 61,051 (2011). Among other things, Order No. 1000 requires RTOs and their member utilities to establish tariff formulas allocating the costs of new transmission facilities in advance. *Id.* P 558.

In response, PJM and its utilities proposed a hybrid formula for new high-voltage facilities: allocate half the costs under the postage-stamp method and half under a new, flow-based method (also called a solution-based distribution-factor method). The flow-based method assigns costs based on how

7

much each utility uses the facility in question over time. Approving the hybrid formula, FERC concluded that it struck a "reasonable balance" between the "broad regional benefits and specifically identifiable benefits" of high-voltage facilities. *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, P 417 (2013) (Compliance Order). FERC also noted that the proposal reflected a "reasonable compromise" to resolve the "intensely practical difficulties" that had provoked extended discord within PJM. *Id.* P 420 (cleaned up). All the member utilities supported the compromise, and no party challenged it in court.

The new formula applied only to high-voltage projects that PJM approved on or after February 1, 2013. *See id.* PP 1, 381, 433. The Compliance Order thus narrowed the *Illinois Commerce* litigation to projects approved between FERC's 2007 postage-stamp order and January 31, 2013. The parties dub these 32 projects the "Vintage Projects." Twenty-nine of them remain in service, and three have been cancelled. Their total cost was about $2.7 billion.

D

Following the Compliance Order and *Illinois Commerce II*, FERC encouraged interested parties to reach a settlement on how to allocate the costs of the Vintage Projects. *PJM Interconnection, L.L.C.*, 149 FERC ¶ 61,233, P 10 (2014). In 2016, several parties proposed a settlement that uses three formulas to assign the costs. Each of them, like the formula approved for post-2013 projects, has a hybrid structure including a postage-stamp component and a usage-based component. Which formula applies depends on when the costs were incurred and whether PJM had cancelled the project.

First, for Vintage Project costs incurred in 2016 or later, the settlement uses the same formula that FERC had approved for new transmission projects—*i.e.*, allocate half the costs

8

through the postage-stamp method and half through the flow-based method. For convenience, we refer to this approach as the "going-forward formula."

Second, the settlement makes a series of adjustments for Vintage Project costs incurred before 2016, which PJM previously had allocated under the postage-stamp method. The adjustments seek to bring the allocations in line with "what would have been credited or paid" had PJM adopted the going-forward formula from the start. J.A. 181. We refer to these adjustments as the "historical formula."

Third, for the cancelled projects, the settlement allocates half the costs through the postage-stamp method and half through the violation method. We refer to this approach as the "cancelled-projects formula."

This proposal received wide support from PJM stakeholders. All the *Illinois Commerce* petitioners joined it, as did many other transmission owners and state regulatory agencies. Together, the supporting or unopposed stakeholders account for virtually all the energy consumption within PJM.

The petitioners here opposed the settlement. Linden VFT, LLC owns a merchant transmission facility that transmits power from PJM to New York. The Long Island Power Authority and its affiliate the Long Island Lighting Company (collectively, LIPA) hold long-term transmission rights over a similar facility. Under the settlement's hybrid allocations, these parties would pay about $30 million more for the Vintage Projects than they would pay under a pure postage-stamp method. Linden and LIPA argued that the settlement was inconsistent with *Illinois Commerce*, with FERC's Remand and Compliance Orders, and with the cost-causation principle.

9

FERC approved the settlement over these objections. *PJM Interconnection, L.L.C.*, 163 FERC ¶ 61,168 (2018) (Settlement Order). Incorporating the reasoning from its Compliance Order, FERC concluded that the going-forward formula allocates costs consistent with the regional and local benefits that each transmission owner receives from each individual facility. *Id.* P 39. FERC approved the historical formula because it roughly recreates the cost allocations that would have occurred had PJM used the going-forward formula from the start of each project. *Id.* P 40. And the Commission concluded that the cancelled-projects formula appropriately substitutes the violation method for the flow-based method because no ongoing usage data existed for cancelled projects. *Id.* P 45. Finally, FERC concluded that the settlement does not make the petitioners worse off relative to the expected outcome of further litigation, which would not likely have replaced the hybrid allocations with a pure postage-stamp method. *Id.* PP 41–43.

LIPA and Linden moved for rehearing of the Settlement Order. Linden also asked FERC to clarify that it was not liable to pay adjustments under the historical formula. The Commission denied both motions. *PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,238 (2019) (Rehearing Order).

LIPA and Linden petitioned for judicial review. Several transmission owners and state regulatory commissions, as well as PJM, have intervened in support of FERC. We have jurisdiction to review the petitions under 16 U.S.C. § 825*l*(b).

II

The Administrative Procedure Act requires us to set aside FERC orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is not arbitrary if the agency has

10

"examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Old Dominion*, 898 F.3d at 1260 (cleaned up). Because ratemaking is imprecise and APA review is deferential, we do not require the Commission to allocate costs with "exacting precision." *Id.* (cleaned up). But we do set aside cost allocations that are either unreasonable or inadequately explained. *See id.*

*Illinois Commerce* and *Old Dominion* illustrate these principles in the context of high-voltage transmission projects. As explained above, the Seventh Circuit twice has set aside a pure postage-stamp allocation, on the ground that it unreasonably ignores the significant local benefits accruing to eastern PJM utilities but not to western ones. In *Old Dominion*, we confronted a PJM tariff amendment that would have required a pure flow-based allocation for certain high-voltage projects. 898 F.3d at 1257–59. We set it aside as unreasonably ignoring the significant regional benefits accruing throughout the PJM grid. *Id.* at 1261–63. Both courts described the contested cost allocations as "grossly disproportionate" to the benefits received by individual utilities. *Id.* at 1261 (quoting *Ill. Com. II*, 756 F.3d at 565).

LIPA and Linden contend that the Settlement Order and its hybrid allocations are likewise arbitrary. We disagree.

A

FERC may approve a contested settlement "if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact." 18 C.F.R. § 385.602(h)(1)(i). FERC reads this language to allow approval when the "overall result of the settlement is just and reasonable," even if "individual aspects" of it "may be problematic." *Trailblazer Pipeline Co.*,

85 FERC ¶ 61,345, 62,342 (1998). In that circumstance, FERC must further conclude that the challenger "would be in no worse position" under the settlement "than if the case were litigated." *Trailblazer Pipeline Co.*, 87 FERC ¶ 61,110, 61,439 (1999). FERC found each of the three hybrid cost allocations here to be just and reasonable, but it also invoked the *Trailblazer* framework and found that LIPA and Linden would not have been better off litigating the merits. We uphold all these findings, which is more than enough to justify the overall settlement.[1]

FERC adequately justified its approval of each formula. Start with the going-forward formula, which allocates costs through a mix of the postage-stamp and flow-based methods. FERC approved the formula based on reasoning in its 2013 Compliance Order, which had approved the same formula for future high-voltage transmission projects. Settlement Order, 163 FERC ¶ 61,168, P 39; Rehearing Order, 169 FERC ¶ 61,238, PP 41–45. Doing so was not arbitrary. As FERC had earlier explained, the postage-stamp component takes account of "the full spectrum of benefits associated with high-voltage facilities, including difficult to quantify regional benefits" such as improved reliability, reduced congestion, and greater carrying capacity. Compliance Order, 142 FERC ¶ 61,214, P 414. We too have recognized that high-voltage transmission systems provide "significant regional benefits" to the PJM network. *Old Dominion*, 898 F.3d at 1260. As for the flow-based component, FERC reasonably looked to usage data as a proxy for specific benefits—in other words, it looked to this data "to identify the subset of customers that benefit from a

---

[1] We thus need not consider whether FERC may approve a settlement without addressing the merits of each contested rate, even though the Federal Power Act requires "[a]ll rates and charges made" to be just and reasonable, 16 U.S.C. § 824d(a).

12

facility simply through electrical proximity." Compliance Order, 142 FERC ¶ 61,214, P 417. And FERC's decision to approve a hybrid formula incorporating both measures was undoubtedly reasonable given the various benefits of high-voltage facilities. Indeed, it is compelled by precedents finding it arbitrary either to ignore local benefits by using a pure postage-stamp method (*Illinois Commerce*) or to ignore regional benefits by using a pure flow method (*Old Dominion*). As for the selection of a 50:50 ratio for the hybrid formula, the materials we have cited make clear that regional and local benefits are both substantial, thus requiring a significant weight for each component of the formula. And any debate over the choice between a 50:50 ratio and, say, a ratio of 60:40 one way or the other would "amount to a quibble about exacting precision," rather than "a wholesale departure from the cost-causation principle." *Old Dominion*, 898 F.3d at 1261 (cleaned up).

The historical formula follows neatly from the going-forward formula. As FERC explained, the historical formula requires adjustments to approximate the cost allocations that would have occurred had PJM applied the going-forward formula from the start of each Vintage Project. Settlement Order, 163 FERC ¶ 61,168, P 40; Rehearing Order, 169 FERC ¶ 61,238, P 48. LIPA and Linden do not challenge this finding. And because the going-forward formula reasonably matches costs to benefits, so does the historical formula.

Finally, FERC reasonably approved the cancelled-projects formula. For these projects, there was no ongoing usage data to support application of the flow-based method. Unable to measure changing usage over time, the parties substituted the violation method to measure which utilities caused the reliability violations that necessitated the projects. Settlement Order, 163 FERC ¶ 61,168, P 45; Rehearing Order, 169 FERC

13

¶ 61,238, P 52.  Under the circumstances, that was a reasonable way to assess usage issues, for the cost-causation principle compares costs to "the burdens imposed or the benefits drawn" by individual utilities.  *Midwest ISO Transmission Owners*, 373 F.3d at 1368.  And as explained above, the 50:50 weighing of local burdens and benefits (as measured by the violation method) and regional benefits (as measured by the postage-stamp method) was also reasonable.

Our determination that each formula in the settlement is just and reasonable is reason enough to uphold it, but we also note that FERC reasonably concluded LIPA and Linden would not have done better through litigation.  The challengers do their best to obscure this point, but what they seek is application of a pure postage-stamp method—or at least a hybrid formula with a more heavily weighted postage-stamp component.  The Seventh Circuit has twice set aside a pure postage-stamp formula for the Vintage Projects.  We have little doubt that, if faced once again with a pure or almost pure postage-stamp formula, it would call strike three.

B

LIPA and Linden make several attacks on FERC's reasoning, but none is persuasive.

*First*, LIPA and Linden contend that the settlement violates *Illinois Commerce II*, which they say requires a cost-benefit analysis to quantify project benefits.  It does not.  The Seventh Circuit discussed cost-benefit analysis at length, but its holding was narrower.  The court set aside the postage-stamp method because, in treating all benefits as regional, it was "guaranteed to overcharge the western utilities" and to produce a "grossly disproportionate" cost allocation.  756 F.3d at 561, 564–65.  As we later explained, the *Illinois Commerce* decisions hold that a postage-stamp regime goes "too far" in

14

weighing regional benefits over local ones, but "nothing in those decisions casts doubt on" FERC's view that high-voltage projects have substantial regionwide benefits. *Old Dominion*, 898 F.3d 1261.  And given that view, FERC had at least "an articulable and plausible reason to believe" that a hybrid, 50:50 formula would make project costs "at least roughly commensurate with" project benefits—which is good enough under *Illinois Commerce II*.  *See* 756 F.3d at 562 (cleaned up).

*Second*, LIPA and Linden contend that FERC could not approve the going-forward formula simply because it matches the one used for new high-voltage projects.  Instead, they contend, the Commission had to separately consider the formula as applied to each Vintage Project.  But while FERC may create different rules for different kinds of projects, *see Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 18 (D.C. Cir. 2021), "a regulator need not always carve out exceptions for arguably distinct subcategories of projects," *Old Dominion*, 898 F.3d at 1262.  Nor must a regulator always consider cost-allocation rules on a project-by-project basis, which would unravel the framework of *ex ante* tariffs established by Order No. 1000 and approved by this Court.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 82–83 (D.C. Cir. 2014).  Instead, FERC must ensure only that there is "some resemblance" between costs and benefits.  *Pub. Serv. Elec. & Gas Co.*, 989 F.3d at 13–14.  And without evidence that the Vintage Projects are different from other high-voltage transmission facilities within PJM, the Commission could reasonably extend to the Vintage Projects the previously approved, unchallenged formula that now generally governs newer projects.[2]

---

[2]  Linden has filed a separate challenge to that formula as applied to two of the newer projects.  *Consol. Edison Co. v. FERC*, No. 15-1183 (D.C. Cir. filed June 25, 2015).  We express no view on the merits of that case.

15

*Third*, LIPA and Linden contend that the Settlement Order failed to explain what they characterize as a departure from the decision to make the Compliance Order purely prospective. The Compliance Order applied to projects approved after January 2013, and it stated that "administrative complications created by implementing the hybrid method should be limited, since this method will apply on a prospective basis only." 142 FERC ¶ 61,214, P 433. But the order did not disfavor any further applications of the same formula. Instead, it stressed that the Order No. 1000 compliance process remained ongoing, and the governing formulas remained subject to change. *Id.* PP 431–32. So there was no inconsistency when FERC, after five years of experience with the hybrid formula, allowed the parties to extend it to the Vintage Projects. *See* Settlement Order, 163 FERC ¶ 61,168, P 39. Nor was there any lack of explanation on this point. As FERC later noted, the Compliance Order's "prospective application" did "not preclude the parties and the Commission from using a just and reasonable cost method in a settlement to resolve a remanded proceeding." Rehearing Order, 169 FERC ¶ 61,238, P 46.

*Fourth*, LIPA and Linden contend that the Settlement Order impermissibly departed from the 2012 Remand Order, which rejected the violation method "as the sole basis for allocating costs" of high-voltage projects. 138 FERC ¶ 61,230, P 37. That decision reasoned that the violation method does not account for either (1) the specific benefits that utilities receive from using the facilities over time or (2) the facilities' regionwide benefits. *Id.* PP 37–47. In approving the settlement, FERC reasonably addressed both points. As it explained, accounting for ongoing usage over time is impossible for cancelled projects, and the postage-stamp component of the hybrid formula adequately accounts for regionwide benefits. Settlement Order, 163 FERC ¶ 61,168, P 45; Rehearing Order, 169 FERC ¶ 61,238, P 54.

16

*Finally*, LIPA and Linden contend that FERC prevented them from contesting the settlement in a live hearing. But FERC has discretion to resolve disputed issues on a written record. *Minisink Residents for Envt'l Pres. & Safety v. FERC*, 762 F.3d 97, 114 (D.C. Cir. 2014). Here, the Commission relied on the extensive written records compiled in this proceeding and in the Order No. 1000 compliance proceeding. Moreover, LIPA and Linden had ample opportunity to object through written submissions, which they did in nearly 20 filings including five expert affidavits. FERC did not abuse its discretion in approving the settlement on a written record.

III

Linden further contends that, under the settlement, it need not make any of the payments set forth in the historical formula. We agree.

The historical formula imposes monthly Transmission Enhancement Charge adjustments (TEC adjustments) beginning in January 2016 and continuing through December 2025. The "[e]ffective [d]ate" of these TEC adjustments is January 1, 2016. J.A. 100. For merchant transmission facilities, the TEC adjustments are based on "Firm Transmission Withdrawal Rights," which are guaranteed rights to transmit electricity. PJM Tariff, sched. 12(b)(x)(B)(2). Linden surrendered its withdrawal rights on January 1, 2018, almost five months before FERC approved the settlement. The parties agree that Linden thus need not pay TEC adjustments for 2018 to 2025. They disagree over whether Linden must pay TEC adjustments for 2016 and 2017.

Section 4(c) of schedule 12-C of the PJM tariff imposes the TEC adjustments. Section 4(c)(i)(2) provides the following "adjustment" to the adjustments:

17

> If all Responsible Customers in a Zone or Merchant
> Transmission Facility are no longer subject to
> Transmission Enhancement Charges under the PJM
> Tariff during the period in which Transmission
> Enhancement Charge Adjustments are collected, then,
> during the portion of that period that such Responsible
> Customers are not subject to Transmission
> Enhancement Charges, the payments from or credits
> to such Responsible Customers shall cease .…

J.A. 101–02.  Linden is the only responsible customer in its
merchant facility.  According to Linden, the "period in which
[TEC] Adjustments are collected" began when FERC approved
the settlement, because PJM did not and could not collect any
payments before then.  Therefore, Linden reasons, it was "no
longer subject to" TEC adjustments during any of that period,
and so its "payments … shall cease."  FERC responds that TEC
adjustments began to accrue—and thus were "collected"—as
soon as the settlement became effective in January 2016.  In
resolving this dispute over tariff interpretation, we must
enforce unambiguous tariff language, but defer to FERC's
reasonable interpretation of ambiguous text.  *Colo. Interstate
Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010).

    The plain meaning of "collected" unambiguously supports
Linden.    Section 4(c)(i)(2) concerns the collection of
"adjustments"—*i.e.*, financial liabilities for which payment can
be obtained.  In that context, "collect" means "[t]o call for and
obtain payment of."  *Collect*, *American Heritage Dictionary*
(5th ed. 2018); *accord Collect*, *Oxford English Dictionary* (2d
ed. 1989) ("[t]o gather (contributions of money, or money due,
as taxes, etc.) from a number of people").  FERC has not
identified a single example, in a dictionary or otherwise, where
"collect" means to accrue liability.  Nor have we found any.

18

This strongly suggests that "collect" simply cannot bear that meaning. *See DHS v. MacLean*, 574 U.S. 383, 394 (2015).

Context confirms that "collect" here means collect. As FERC notes, schedule 12-C imposes liability for TEC adjustments beginning on its "[e]ffective [d]ate" of January 1, 2016. PJM Tariff, sched. 12-C §§ 2–3. But schedule 12-C also plainly distinguishes the concepts of accrual and collection. For although it imposes liability beginning on the effective date, it permits collection only after an "implementation date" defined as "the date of a FERC order … authorizing PJM to *begin collecting*" TEC adjustments. *Id.* § 3 (emphasis added).

Schedule 12-C's procedures underscore this distinction. During the interim period between the effective and implementation dates, PJM had to "track and accumulate the differences between" what it was collecting under the existing rate and what the settlement would require if FERC approved it. PJM Tariff, sched. 12-C § 3. After the implementation date, PJM would issue "credits or charges" that equaled "the aggregate of such differences." *Id.* Schedule 12-C thus recognizes that utilities began accruing liability as of the settlement's effective date, but that PJM would not "begin collecting" until FERC approved the settlement.

FERC contends that the settlement agreement, which states that "PJM shall collect" adjustments "[e]ffective as of January 1, 2016," J.A. 86–88, shows that collection began as of then. But this language was not incorporated into PJM's tariff, and it is flatly inconsistent with the tariff provisions expressly linking collection to the implementation date rather than the effective date. Because the tariff is unambiguous on this point, it is controlling. *See Colo. Interstate*, 599 F.3d at 701.

19

IV

Linden asks us to vacate FERC's order holding it liable for TEC adjustments. Vacatur is the normal remedy under the APA, which provides that a reviewing court "shall … set aside" unlawful agency action. 5 U.S.C. § 706(2). Nonetheless, we have held that remand without vacatur is sometimes appropriate, depending on the seriousness of the agency error and the disruptive consequences of vacatur. *See Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

For the legal error identified above, vacatur is clearly warranted. The "seriousness" of agency error turns in large part on "how likely it is the agency will be able to justify its decision on remand." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (cleaned up). And disruptive consequences matter "only insofar as the agency may be able to rehabilitate its rationale." *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009). Here, because the controlling tariff provision is unambiguous, FERC cannot rehabilitate its preferred interpretation on remand.

The intervenors contend that a remand without vacatur would have been warranted had we set aside the entire settlement on the ground that FERC's approval was inadequately reasoned. Having upheld the settlement, we need not consider that argument. We note only that the concerns raised by the intervenors, positing a highly disruptive judicial intervention based on a likely curable agency error, have no application to the narrow legal error that we have identified.

V

For these reasons, we set aside FERC's ruling that Linden must pay TEC adjustments, and we remand for any further

20

proceedings that may be necessary to implement this ruling.  In all other respects, we deny the petitions for review.

*So ordered.*